1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6                         SAN JOSE DIVISION

7

8    PANIANI TAAFUA, an individual, on          Case No.  18-cv-06602-VKD
     behalf of himself and others similarly
9    situated,
                                                **ORDER DENYING MOTION FOR**
10                Plaintiff,                     **PRELIMINARY APPROVAL OF**
                                                **CLASS ACTION SETTLEMENT**
11          v.
                                                Re: Dkt. No. 34
12   QUANTUM GLOBAL TECHNOLOGIES,
     LLC,
13
                  Defendant.
14

15          Plaintiff Paniani Taafua filed this action for himself, and on behalf of a putative class, for

16   alleged violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681b(b)(2)(A)(i)-(ii),

17   based on a disclosure form used by defendant Quantum Global Technologies ("QGT") that

18   reportedly included an extraneous liability waiver.  The parties have agreed to a settlement, and

19   Mr. Taafua now moves for preliminary approval of that settlement.  QGT does not oppose the

20   motion.  The Court held a hearing on the motion on August 27, 2019.  Pursuant to the Court's

21   order (Dkt. No. 38), the parties subsequently submitted supplemental briefing on certain issues

22   (Dkt. No. 40).  Upon consideration of the moving papers,[1] the parties' supplemental briefing, as

23   well as the arguments of counsel, the Court denies the motion for preliminary approval of class

24

25   _____

26   [1] The Court has not considered portions of a declaration submitted by one of Mr. Taafua's
     attorneys, which repeats many of the legal arguments included in Mr. Taafua's motion.  *See, e.g.,*
27   Dkt. No. 34-1 ¶¶ 18, 22-30, 32-33, 36, 40, 42, 44.  "An affidavit or declarations may contain only
     facts, must conform as much as possible to the requirements of Fed. R. Civ. P. 56(e), and must
28   avoid conclusions and argument."  Civ. L.R. 7-5(b).

settary.[2]

# I.  BACKGROUND

## A.  The FCRA and Mr. Taafua's Claims

"The FCRA seeks to ensure 'fair and accurate credit reporting.'"  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1545 (2016) (quoting 15 U.S.C. § 1681(a)(1)).  As relevant here, the FCRA imposes certain requirements on those who seek to obtain consumer reports[3] for employment purposes.  15 U.S.C. § 1681b(a)(3)(B).  At issue in this action is the FCRA's so-called "stand-alone disclosure" requirement, which essentially requires that a person seeking to procure a consumer report for employment purposes must first (1) provide the subject consumer with a "clear and conspicuous disclosure . . . in a document that consists solely of the disclosure" that such a report may be obtained and (2) obtain the consumer's written authorization:

> Except as provided in subparagraph (B), a person may not procure a consumer report, or cause a consumer report to be procured, for employment purposes with respect to any consumer, unless—
>
> (i) a clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured or caused to be procured, in a document that consists solely of the disclosure, that a consumer report may be obtained for employment purposes; and
>
> (ii) the consumer has authorized in writing (which authorization may be made on the document referred to in clause (i)) the procurement of

---

[2] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge.  28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  The consent of absent class members is not required for this Court to exercise jurisdiction over this matter.  *Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1076 (9th Cir. 2017).

[3] The term "consumer report" means:

> [A]ny written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for—
>
> (A) credit or insurance to be used primarily for personal, family, or household purposes;
> (B) employment purposes; or
> (C) any other purpose authorized under section 1681b of this title.

15 U.S.C. § 1681a(d)(1).

2

the report by that person.

*Id*. § 1681b(b)(2)(A).  The Ninth Circuit has held that this provision unambiguously requires a disclosure document that "consists solely of the disclosure," and does not permit the inclusion of a liability waiver in the same document.  *Syed v. M-I, LLC*, 853 F.3d 492, 503 (9th Cir. 2017).  "[A] prospective employer does not violate Section 1681b(b)(2)(A) by providing a disclosure that violates the FCRA's disclosure requirement."  *Id*. at 506.  Rather, the violation occurs when "a prospective employer . . . procures a job applicant's consumer report after including a liability waiver in the same document as the statutorily mandated disclosure."  *Id.* at 496.  Additionally, "in light of the clear statutory language that the disclosure document must consist 'solely' of the disclosure, a prospective employer's violation of the FCRA is 'willful' when the employer includes terms in addition to the disclosure, such as the liability waiver here, before procuring a consumer report or causing one to be procured."  *Id*.

For willful violations, the FCRA allows recovery of "actual damages sustained by the consumer as a result of the failure" or statutory "damages of not less than $100 and not more than $1,000"; "punitive damages as the court may allow"; and "in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court."  15 U.S.C. § 1681n(a).

According to Mr. Taafua's complaint, QGT "provides outsourced process tool parts cleaning and engineering services."  Mr. Taafua was employed by QGT from September 14, 2015 through February 2018.  Dkt. No. 1 ¶¶ 2, 8; Dkt. No. 13 ¶¶ 2, 8.  QGT reportedly required all prospective employees, including Mr. Taafua, to sign a standard company form[4] authorizing QGT to obtain a consumer report from third party First Contact HR to verify an applicant's background and experience.  Mr. Taafua contends that because QGT's form included a liability waiver, in addition to a disclosure concerning a consumer report, QGT violated the FCRA's stand-alone disclosure requirement and, as a result, also never received proper authorizations for any reports it

---

[4] At oral argument, there was a suggestion that QGT may have used different forms during the putative class period, but QGT stated that all of the forms were substantively the same.  Dkt. No. 39.

obtained using its standard form. Mr. Taafua further alleges that he "was confused by the standard disclosure and authorization form and did not understand that [QGT] would be requesting a consumer report as defined in the FCRA." Dkt. No. 1 ¶ 10. He goes on to allege that "[n]onetheless, upon information and belief, [QGT] then secured a consumer report from First Contact HR." *Id*.

On October 30, 2018, Mr. Taafua filed the present putative class action asserting two claims for relief based on alleged violation of FCRA, 15 U.S.C. § 1681b(b)(2)(A)(i) and § 1681b(b)(2)(A)(ii). The complaint defines the putative class as follows:

> [A]ll persons in the United States who signed a background check form as administrated by First Contact HR that included an authorization and a liability release clause at any time during the period beginning five (5) years prior to the filing of this Complaint and ending on the date as determined by the Court.

*Id*. ¶ 33. The complaint seeks statutory damages, punitive damages, attorney's fees, costs, and "[s]uch other and further relief as the Court deems just and equitable." *Id*. at 13.

The Court held an initial case management conference in this matter on February 5, 2019. Shortly afterward, QGT moved to transfer this case pursuant to 28 U.S.C. § 1404(a), for the convenience of the parties and in the interest of justice, to the U.S. District Court for the Eastern District of Pennsylvania. Dkt. No. 25. Mr. Taafua opposed that motion, and that matter was fully briefed. However, on May 9, 2019, just prior to the noticed motion hearing, the parties advised that they reached a settlement. Dkt. No. 30.

### B. Proposed Settlement

For settlement purposes, the class period begins on October 30, 2013 (i.e., five years prior to the filing of Mr. Taafua's complaint) and ends on December 31, 2018. Additionally, the scope of the putative class has been narrowed to QGT applicants and/or employees who were the subject of a consumer report procured, or caused to be procured, by QGT:

> all individuals who applied for employment with and/or were employed by Defendant in the United States and were the subject of a consumer report that was procured by Defendant or caused to be procured by Defendant through third-party consumer reporting agency First Contact HR during the Class Period.

Dkt. No. 34-2, Section I.2. Unlike the complaint's class definition, which included "all persons in

the United States who signed a background check form" (Dkt. No. 1 ¶ 33), this narrowed class definition appears to comport with *Syed*'s holding that a prospective employer violates the FCRA's stand-alone disclosure requirement, not by providing an improper disclosure form, but by "procur[ing] a job applicant's consumer report after including a liability waiver in the same document as the statutorily mandated disclosure." 853 F.3d at 496.

The proposed settlement is non-reversionary and contemplates a release of claims in return for a total payment of $125,902 ("Global Settlement Fund"). *See* Dkt. No. 34-2 ("Settlement Agreement"). The Settlement Agreement provides that the agreed-upon release of liability encompasses the following:

> [A]ny and all claims of any kind whatsoever, whether known or unknown, whether based on common law, regulations, statute, or a constitutional provision, under state, federal or local law, arising out of the allegations made in the Action and that reasonably arise, or could have arisen, out of the facts alleged in the Action as to the Class Members, including but not limited to, claims arising from the procurement of a consumer report on them by any of the Released Parties, and any other claims for violations of the Fair Credit Reporting Act, 15 U.S.C. §1681b, *et seq.*, or related federal, state, and/or local laws whether willful, or otherwise, for declaratory relief, statutory damages, punitive damages, costs, and attorneys' fees.

Dkt. No. 34-2, Section III.17. Additionally, the release notes that "[n]otwithstanding the foregoing, nothing in the Settlement releases any claims that cannot be released as a matter of law." *Id.* Although the release somewhat broadly refers to claims that either arise or could have arisen out of the facts alleged in this lawsuit "including but not limited to claims arising from the procurement of a consumer report" and "any other claims for violations of the [FCRA], 15 U.S.C. § 1681b, *et seq.*" and related laws, the allegations of Mr. Taafua's complaint are limited to discrete facts concerning the notice that QGT reportedly provided before procuring a background check. As such, the release appears to be properly limited to the factual predicate underlying the present action. *See Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) ("A settlement agreement may preclude a party from bringing a related claim in the future even though the claim was not presented and might not have been presentable in the class action, but only where the released claim is based on the identical factual predicate as that underlying the claims in the settled class action.") (internal quotations omitted).

From the $125,902 Global Settlement Fund, the parties anticipate that $16,000 will be paid to cover settlement administration costs. Additionally, Mr. Taafua's attorneys seek an award of approximately 33.33% of the Global Settlement Fund, or $41,967.33, plus $3,000 in costs, for a total of $44,967.33. Mr. Taafua also requests a $5,000 service award. Dkt. No. 34-2, Section III.

The remaining $59,934.67 ("Net Settlement Fund") is to be distributed to an estimated class of 1,041[5] members as to whom 1,476 consumer reports were obtained. Dkt. No. 34-2, Section III.4; Dkt. No. 40 at 2. "The amount of each individual payment will equal the Net Settlement Fund divided by the number of consumer reports obtained for the Settlement Class Members." Dkt. No. 34-2, Section III.4. The number of reports obtained for each member may vary, and individual members may be entitled to more or less money, depending on the number of reports that were obtained for that individual. *Id.* Settlement checks that are not cashed within 180 days of issuance will be void. *Id.*, Section III.11.

Any unclaimed portion of the Global Settlement Fund will be given as a *cy pres* award to the Education Fund of the National Association of Consumer Advocates ("NACA"), identified in the moving papers as a non-profit organization. Dkt. No. 34 at 4; Dkt. No. 34-2, Section III.11. In supplemental briefing, the parties further advise that NACA focuses on consumer rights and that its activities include "fostering justice for consumers, promoting consumer legal rights, educating the public about relevant issues, encouraging communication between consumers, consumer advocates and consumer attorneys, and engaging in activities that describe and expose unfair business practices that harm consumers." Dkt. No. 40 at 8. NACA thus appears to meet the test "that there be a driving nexus between the plaintiff class and the *cy pres* beneficiaries." *Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012) (internal quotations and citation omitted). Additionally, the parties and their counsel confirm that they do not have a prior or existing relationship with NACA. Dkt. No. 40 at 8.

---

[5] The number of putative class members is slightly lower than the original estimate of 1,058. In supplemental briefing, the parties advise that QGT has determined that due, for example, to surname changes, some of the identified names refer to only one unique individual, rather than to different individuals. Dkt. No. 40 at 2 n.1.

The Settlement Agreement provides that the Global Settlement Fund may be increased at QGT's discretion, if (as verified by the settlement administrator) the number of consumer reports QGT procured increases more than 5% over the original estimate of 1,476. However, the Settlement Agreement also provides that Mr. Taafua has the option to terminate the settlement if QGT declines to increase the Global and/or Net Settlement Fund. Dkt. No. 34-2, Section III.7. Additionally, if (as verified by the settlement administrator) the number of putative class members increases more than 5% beyond the current estimate, then no increase in the Global Settlement Fund is contemplated.[6] However, QGT agrees to pay for any resulting increase in the settlement administrative costs. *Id*.

After discussing two potential third party settlement administrators, and using a bid process, the parties agreed to use JND Legal Administration ("JND" or "Settlement Administrator"), which submitted a lower bid. The procedures JND will use to provide notice to the class are discussed in more detail below.

Mr. Taafua now moves for preliminary approval of the settlement. As noted above, QGT does not oppose the motion. For the reasons discussed below, although the Court concludes that Mr. Taafua has standing to pursue this action, he has not demonstrated that Rule 23 class certification is warranted or that the proposed settlement is fair, reasonable and adequate.

## II.   LEGAL STANDARD

Court approval is required for the settlement of Rule 23 class actions. *See* Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the court's approval."). The Ninth Circuit has declared that a strong judicial policy favors settlement of Rule 23 class actions. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). However, no broad presumption of fairness applies to such settlements. *Roes v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 2019 WL 6721190, at *10 (9th Cir. 2019). And where the parties reach a

---

[6] At oral argument, the parties indicated that they expect the number of putative class members may decrease, not increase. As noted above, the parties' supplemental briefing indicates that the size of the putative class has, in fact, decreased from the original estimate due to name changes.

settlement before class certification, courts must "employ[] extra caution and more rigorous scrutiny," *id.*, and "peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement," *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). *See also In re Bluetooth Headset Products Liability Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) ("Prior to formal class certification, there is an even greater potential for a breach of fiduciary duty owed the class during settlement. Accordingly, such agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair.").

First the Court must assess whether a class exists. *Staton*, 327 F.3d at 952. Second, the Court must assess whether the proposed settlement is "fundamentally fair, adequate, and reasonable," considering "the settlement taken as a whole, rather than the individual component parts, that must be examined." *Id.* (internal quotations and citation omitted).

## III.    DISCUSSION

### A.    Standing

Preliminarily, the Court addresses Mr. Taafua's standing to pursue the claims asserted in this action.[7] Under Article III of the United States Constitution, federal courts have jurisdiction to decide only actual "Cases" or "Controversies," U.S. Const., art. III, § 2, and Mr. Taafua has standing to sue if he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*, 136 S. Ct. at 1547; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Mr. Taafua's claimed injury must be both "particularized" and "concrete." A "particularized" injury is one that "'affect[s] the plaintiff in a personal and individual way.'" *Spokeo, Inc.*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560 n.1)). A "concrete" injury "must actually exist" and must be "real, and not abstract." *Id.* To assert a "concrete" injury, a plaintiff cannot simply "allege a bare procedural violation, divorced from any concrete harm, and satisfy

---

[7] Although Mr. Taafua argues that standing is a factor to consider in assessing the risks of litigation, the issue of Mr. Taafua's standing to pursue the present litigation implicates the Court's jurisdiction over this action. Accordingly, the Court addresses this issue at the outset.

the injury-in-fact requirement of Article III." *Id*. at 1549.

In the FCRA context, the Ninth Circuit has noted that "[t]he disclosure requirement at issue, 15 U.S.C. § 1681b(b)(2)(A)(i), creates a right to information by requiring prospective employers to inform job applicants that they intend to procure their consumer reports as part of the employment application process." *Syed*, 853 F.3d at 499. Additionally, "[t]he authorization requirement, § 1681b(b)(2)(A)(ii), creates a right to privacy by enabling applicants to withhold permission to obtain the report from the prospective employer, and a concrete injury when applicants are deprived of their ability to meaningfully authorize the credit check." *Id*. "By providing a private cause of action for violations of Section 1681b(b)(2)(A), Congress has recognized the harm such violations cause, thereby articulating a "'chain[ ] of causation that will give rise to a case or controversy.'" *Id*. (quoting *Spokeo*, 136 S.Ct. at 1549).

Here, Mr. Taafua alleges that QGT violated his individual statutory rights under the FCRA by including an extraneous liability waiver in its disclosure form; that he was "confused" by QGT's "standard form document and did not understand that [QGT] would be requesting a 'consumer report' as defined in the FCRA"; and that QGT proceeded to "obtain[ ] a consumer report" without a valid authorization. Dkt. No. 1 ¶¶ 10, 32. These allegations are sufficient to establish that Mr. Taafua suffered a particularized and concrete injury giving rise to an Article III case or controversy. *See Syed*, 853 F.3d at 499-500 (concluding that the plaintiff's claims were sufficient to infer that he was deprived of his statutory rights under the FCRA and was not aware that he was signing a waiver authorizing a credit check when he signed the disclosure form at issue); *Brown v. Core-Mark Int'l, Inc.*, No. 18-cv-07451- JCS, 2019 WL 2076708, at *4 (N.D. Cal. May 10, 2019) (same).

Accordingly, Mr. Taafua has standing to pursue the asserted claims.

## B. Rule 23 Class Certification Concerns

The Court next considers the propriety of class certification. Mr. Taafua bears the burden of establishing, by a preponderance of the evidence, that class certification is appropriate under Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be

prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.").  Class certification under Rule 23 requires two steps.  First, Mr. Taafua must satisfy the four prerequisites under Rule 23(a), namely numerosity, commonality, typicality and adequacy of representation.  *Id*. at 349.  Additionally, Mr. Taafua must show that at least one of the bases for certification under Rule 23(b) is met.  *Amchem. Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).  Here, Mr. Taafua seeks certification under Rule 23(b)(3) and therefore must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

### 1.    Rule 23(a) Certification

#### a.    Numerosity

The Court has no concerns regarding numerosity.  Under Rule 23(a), the class must be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  While there is no fixed number for this requirement, courts generally find that numerosity is satisfied for classes consisting of 40 or more members.  *In re Facebook, Inc. PPC Advertising Litig.*, 282 F.R.D. 446, 452 (N.D. Cal. 2012).  Here, the numerosity requirement is met as there are 1,041 putative class members.

#### b.    Commonality

The Court also has no concerns regarding commonality.  Rule 23(a)(2) requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  A question is common where "it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Dukes*, 564 U.S. at 350.  "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."  *Id*. (citation omitted).  A single common question is sufficient to satisfy Rule 23(a)(2).  *Id*. at 359.  In the present matter, there are at least two common contentions that apply to every putative class members' claim:  (1) whether QGT's disclosure form contained an extraneous liability waiver and, if so, (2) whether QGT procured a consumer

report for the subject putative class member without proper authorization. Accordingly, the commonality requirement is met.

### c. Typicality

On the record presented, the Court has concerns about typicality. Rule 23(a) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class," and the "test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quotations and citations omitted). The typicality requirement is satisfied where representative claims "are reasonably coextensive with those of absent class members; they need not be substantially identical." *Staton*, 327 F.3d at 957 (internal quotations and citation omitted). However, "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hanon*, 976 F.2d at 508 (internal quotations and citation omitted).

Here, Mr. Taafua's claims are typical of the class in some respects, but not typical in others. QGT's alleged conduct was uniform across the entire class, and each class member reportedly suffered the same injury. Specifically, QGT is alleged to have procured one or more consumer reports for each putative class member, after having provided the class member with a disclosure form that included an extraneous liability waiver. However, there is an issue whether Mr. Taafua's claims timely were filed within the statute of limitations. The FCRA requires a plaintiff to bring his claims within "2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability" or "5 years after the date on which the violation that is the basis for such liability occurs," whichever is earlier. 15 U.S.C. § 1681p. QGT contends that its employment offer letter conditioned employment on passing a background check, and Mr. Taafua therefore knew or should have known, at least several years prior to filing this suit, that QGT conducted a background check when he was hired in 2015. Mr. Taafua asserts that he was

unaware of QGT's background check until he received his personnel file from QGT sometime in 2018, well within the two-year limitations period.  Dkt. No. 40 at 3.

To satisfy the typicality requirement, Mr. Taafua "need not prove that [he] is immune from any possible defense, or that h[is] claim will fail only if every other class member's claim also fails."  *Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*, 326 F.R.D. 592, 608 (N.D. Cal. 2018) (internal quotations and citation omitted).  "Instead, [he] must establish that [he] is not subject to a defense that is not typical of the defenses which may be raised against other members of the proposed class."  *Id.* (internal quotations and citation omitted).  Some courts have concluded that the typicality requirement is not met where the named plaintiff faces a significant statute of limitations problem that is not shared by other members of the putative class.  *See, e.g., Plascencia v. Lending 1st Mortgage, LLC*, 259 F.R.D. 437, 444 (N.D. Cal. 2009) (concluding that the typicality requirement was not met where the plaintiffs' claim depended upon an exception to the statute of limitations and the limitations issue was "a major issue in the defense of [that] claim."); *Burton v. Mountain West Farm Bureau Mut. Ins. Co.*, 214 F.R.D. 598, 609 (D. Mont. 2003) (concluding that a proposed intervenor's claim was not typical of the class where that claim arose outside the limitations period).

However, courts have come to different conclusions where a limitations defense applies to the named plaintiff and some but not all class members.  Recently, two courts in this district have concluded that a statute of limitations issue did not preclude class certification, or approval of a proposed class settlement, where other members of the class were also very likely subject to the same limitations defense as the class representatives.  *See, e.g., Corcoran v. CVS Health*, No. 15-cv-03504-YGR, 2019 WL 6250972, at *5 (N.D. Cal. Nov. 22, 2019) (concluding that the typicality requirement was satisfied where, in view of a lengthy class period, other class members were "very likely to be subjected to the same statute of limitations defense as both [class representatives]," and the class representatives therefore were not "*uniquely* subjected to the statute of limitations."); *Schofield v. Delta Air Lines, Inc.*, No. 18-cv-00382-EMC, 2019 WL 955288, at *3-*4 (N.D. Cal. Feb. 27, 2019) (concluding, in a suit over the FCRA stand-alone requirement, that the typicality requirement was met where "all class members, including the

named class representative, will likely face the same challenge with respect to a statute of limitations defense.").[8]  By contrast, at least one court has concluded that the typicality requirement was not met where a statute of limitations defense affected the claims of the named plaintiffs and those of a subclass, but not other class members.  *See Vizzi v. Mitsubishi Motors N. Am., Inc.*, No. SACV 08-00650-JVS (RNBx), 2010 WL 11515266, at *3 (C.D. Cal. Feb. 22, 2010).  In *Vizzi*, the court was particularly concerned that the potential untimeliness of the named plaintiffs' claims was a significant risk factor the named plaintiffs shared with the subclass, but not a risk factor for the other class members.  *Id.* at *2 ("Although Vizzi's claim is typical of others in that he owns a black Mitsubishi vehicle with a model year within the 2000–2008 period, and his legal claims arising from the paint delamination would be similar to others in the class, his case is atypical because it may be subject to a statute of limitations defense unique to his claim and the claims of a subclass, while other class members do not face the same difficulty.").

As described above, the parties have agreed to a settlement that encompasses all employees/employment applicants, including Mr. Taafua, for whom QGT procured consumer reports during a five-year period preceding the filing of the present action.  Given the length of the settlement class period, approximately half of the class will be subject to a defense that their claims were not timely filed within the two-year statute of limitations, while the other half of the class will not have to contend with this defense at all.  Indeed, the parties' supplemental briefing indicates that approximately half of the 1,476 consumer reports in question were obtained outside the two-year limitations period.  Dkt. No. 40 at 2.[9]  While Mr. Taafua's claims are not "uniquely" subject to the statute of limitations defense, his claims are typical of only about half the class and

---

[8] Additionally, the distribution of the settlement funds in *Schofield* appears to have been structured in a way that accounted for limitations issues among various class members, such that members with older claims received a smaller share of the settlement.  *See Schofield*, 2019 WL 955288 at *2.

[9] In supplemental briefing, QGT suggests that the statute of limitations is not a significant issue because neither Mr. Taafua's claims, nor those of any putative class member, fall outside the FCRA's five-year limitation period.  Dkt. No. 40 at 4-5.  As discussed above, the FCRA provides that claims must be brought within two years of discovery of the violation or five years after the violation occurs, *whichever is earlier*.  15 U.S.C. § 1681p.  QGT's assertions about the five-year limitations period therefore are irrelevant.

are atypical of the other half.

The Court expresses no opinion regarding the strength of QGT's limitations defense or of Mr. Taafua's assertions concerning his discovery of the alleged violations. Nevertheless, for the purpose of assessing the propriety of the settlement, and under the particular circumstances presented here, the Court concludes, as in *Vizzi*¸ that Mr. Taafua's claims do not satisfy the typicality requirement because the potential statute of limitations issue poses a significant procedural hurdle that does not affect a considerable portion of the putative class's claims. Indeed, the statute of limitations issue appears to be the only notable hurdle to the relief sought in this action. As discussed above, *Syed* provides considerable clarity regarding Mr. Taafua's claims, particularly with respect to issues of standing and willfulness.[10] *See Syed*, 853 F.3d at 496; *see also Gilberg v. Cal. Check Cashing Stores, LLC*, 913 F.3d 1169, 1173 (9th Cir. 2019) ("*Syed* held that 'a prospective employer violates Section 1681b(b)(2)(A) when it procures a job applicant's consumer report after including a liability waiver in the same document as the statutorily mandated disclosure.'").[11]

As such, there is a real possibility that class members who have no limitations issues would be harmed by the time and preoccupation Mr. Taafua and other affected class members would have to devote to such defenses. Additionally, the Court cannot disregard the possibility that the potential weakness of Mr. Taafua's claims resulted in a lower settlement for the class as a whole, particularly for those class members whose claims have no such timing issues. Moreover, there is no "broad composition of the representative parties" that might adequately represent the interests of any subclass of members who do not face similar limitations issues that affect Mr.

---

[10] Although *Syed* appears to provide an important ruling that is directly relevant to Mr. Taafua's claims, he did not cite to that decision in his moving papers.

[11] In his moving papers, Mr. Taafua argued that issues regarding his standing to pursue his claims would have been complicated by "evidence showing the allegedly non-compliant disclosure was followed by a compliant disclosure administered to the putative class." Dkt. No. 34 at 19. Nevertheless, at oral argument, Mr. Taafua's counsel stated that they may have been mistaken about the issuance of any corrective notice, and as noted above, QGT stated that all disclosure forms used during the relevant period were substantively the same. In any event, QGT seemed to acknowledge that a subsequent corrective notice would not cure a FCRA violation that had already occurred.

Taafua. *Cf. Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998) (affirming a finding of typicality in view of the "broad composition of the representative parties" and the "narrow focus" of the requested relief), *overruled on other grounds by Wal-Mart v. Dukes*, 564 U.S. 338 (2011).

Accordingly, the Court concludes that Mr. Taafua's claims are not typical of the class as a whole.

### d.     Adequacy of Representation

For much the same reasons, the Court also has concerns regarding adequacy of representation. Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In assessing this factor, the Court addresses two legal issues, i.e., whether Mr. Taafua and his counsel (1) have any conflicts of interest with other class members, and (2) will prosecute the action vigorously on behalf of the class. *Staton*, 327 F.3d at 957. On the record presented, the Court finds no reason to question the competence or experience of Mr. Taafua's counsel. However, because Mr. Taafua faces a potential statute of limitations defense that approximately half of the class does not, his claims are significantly weaker than those of class members with indisputably timely claims. These circumstances suggest that Mr. Taafua has a conflict of interest that has not been adequately addressed and which may have affected the agreed-upon settlement amount. The Court concludes that Mr. Taafua, alone, does not adequately represent the interests of the class as a whole due to this conflict of interest.

### 2.     Rule 23(b)(3) Certification

Mr. Taafua seeks to certify the proposed class under Rule 23(b)(3), which requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Based on its review of the record the Court concludes that while the superiority requirement is satisfied, the predominance requirement is not.

In determining whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," courts consider four nonexclusive factors: (1) the class

members' interests in individually controlling the prosecution or defense of separate actions;

(2) the extent and nature of any litigation concerning the controversy already commenced by or

against the class; (3) the desirability of concentrating the litigation of the controversy in the

particular forum; and (4) the difficulties likely to be encountered in managing a class action.  Fed.

R. Civ. P. 23(b)(3).  Mr. Taafua has met the superiority requirement.  The record presented

indicates that the damages at issue likely are not great enough for individual putative class

members to want to litigate separate actions against QGT.  Additionally, at oral argument, the

parties were unable to identify any other litigation already commenced by or against the class.[12]

Dkt. No. 39.  Handling the 1,041 individual cases in a single class action is a more efficient use of

the Court's and parties' resources and the most economical way to resolve common questions

about defendants' alleged FCRA violations.  Further, the present forum is appropriate,[13] and there

are no obvious difficulties in managing this case as a class action.

However, the Court concludes that Mr. Taafua has not satisfied the predominance inquiry.

Even when a plaintiff establishes that Rule 23(a)'s commonality requirement is met by the

existence of common questions of law or fact, "the predominance criterion is far more

demanding," *Amchem Products, Inc.*, 521 U.S. at 624, and "tests whether proposed classes are

sufficiently cohesive to warrant adjudication by representation."  *Id.* at 623.  In assessing

predominance, the Court "asks whether the common, aggregation-enabling, issues in the case are

more prevalent or important than the non-common, aggregation-defeating, individual issues."

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016) (internal quotations and citations

omitted).  Here, Mr. Taafua has shown that the issues in dispute concern QGT's allegedly

unlawful disclosure form, which was used to procure one or more consumer reports for all class

---

[12] Defense counsel alluded to a separate wage-and-hour class action that was filed against QGT at some point in time.  Defense counsel, however, state that their firm was not involved in that matter; and, while counsel acknowledged the possibility that some of the wage-and-hour class members may overlap with the settlement class in question here, neither side identified any other pending lawsuits concerning the FCRA claims at issue in the present action.

[13] As discussed above, QGT previously sought to transfer this matter to the Eastern District of Pennsylvania for convenience pursuant to 28 U.S.C. § 1404(a).  QGT did not dispute that venue is proper in the Northern District of California.  Dkt. No. 25.

members during the putative class period.  However, for Mr. Taafua and approximately half of the class members, QGT's liability will depend on whether they can overcome QGT's statute of limitations defense.[14]  For this half of the class, statute of limitations issues are at least as significant as disputed issues concerning QGT's allegedly unlawful disclosure form.

In sum, for purposes of settlement, the Court concludes that provisional certification of a Rule 23 class is not appropriate.

### C.     The Proposed Settlement Is Not Fair, Reasonable, or Adequate

Rule 23(e) "requires the district court to determine whether a proposed settlement is fundamentally fair, adequate, and reasonable."  *Hanlon.*, 150 F.3d at 1026  In making that determination, district courts consider several factors, including:

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Id.*  The 2018 amendments to Rule 23 require the Court to consider a similar list of factors before approving a settlement, including whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
> > (i) the costs, risks, and delay of trial and appeal;
> >
> > (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> >
> > (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

---

[14] The record also suggests that the amount of damages to which each putative class member is entitled will vary, depending on how many consumer reports were procured for that individual. However, individualized damages alone do not defeat Rule 23(b)(3) certification.  *Tyson Foods*, 136 S.Ct. at 1045; *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). This list of factors is not intended to displace any factors currently considered by courts, "but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23(e) advisory committee's note to 2018 amendments. The overall purpose of Rule 23(e) is to ensure that class representatives and their counsel do not obtain a disproportionate benefit at the expense of the unnamed class members, who class counsel have a duty to represent. *SFBSC Mgmt., LLC*, 944 F.3d 1035, 2019 WL 6721190 at *10. In determining whether a proposed settlement is fair, the Court must apply "an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e)." *In re Bluetooth*, 654 F.3d at 946.

For the reasons discussed below, there are several indicators that the proposed settlement, viewed as a whole, is not fair, reasonable, or adequate.

### 1.     Strength of Mr. Taafua's Case and Risks of Litigation

With respect to the first three *Hanlon* factors, Mr. Taafua's moving papers posit that "of particular importance to determining the reasonableness of the Settlement are the significant liability questions regarding purported violations of the FCRA." Dkt. No. 34 at 19. Here, Mr. Taafua contends that QGT likely would have argued that he lacked standing to pursue the FCRA claims in question, including arguments that the "alleged violations were technical, and thus did not result in any injuries or damages." *Id*. at 20. Mr. Taafua refers, in a footnote, to *Spokeo*'s guidance regarding the requirement that injuries be "concrete" and "particularized" to confer standing. *Id*. at 19 n.15. However, he never once cites to *Syed*, which as discussed above, is directly relevant to his claims, states that the FCRA provisions at issue create both a right to information and a right to privacy, and further notes that "[b]y providing a private cause of action for violations of Section 1681b(b)(2)(A), Congress has recognized the harm such violations cause, thereby articulating a "'chain[ ] of causation that will give rise to a case or controversy.'" *Syed*,

853 F.3d at 499.  At oral argument, Mr. Taafua contended that, notwithstanding the clarity provided by *Syed*, defendants within the Ninth Circuit continue to litigate matters of standing. While that may be, the Court finds that his assertions as to the risks of continued litigation are overstated.

Mr. Taafua also argues that an additional risk is presented by the potential statute of limitations issue concerning his claims.  Although the Court agrees that the limitations issue is a risk of continued litigation, as discussed below, the proposed settlement appears to take that risk into account at the expense of class members who face no such challenge with respect to their claims.

### 2. The Amount Offered in Settlement

"To evaluate adequacy, courts primarily consider plaintiffs' expected recovery balanced against the value of the settlement offer."  *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007).  In assessing this factor, the Court considers the costs, risks, and delay of trial and appeal; the effectiveness of any proposed method of distributing relief to the class; the terms of any proposed award of attorney's fees, including timing of payment; and any agreement made in connection with the proposed settlement.  Fed. R. Civ. P. 23(e)(2)(C).

For a willful violation of the FCRA, a plaintiff may recover statutory damages of "not less than $100 and not more than $1,000," plus punitive damages, costs and attorneys' fees.  15 U.S.C. § 1681n.  If the parties' proposed settlement is approved, the recovery in this case would be a net sum of $59,934.67 to be distributed among approximately 1,041 class members based on the procurement of 1,476 consumer reports.

In his moving papers, Mr. Taafua asserted that the proposed settlement would result in an estimated net payment per class member of $56.65.  Dkt. No. 34 at 2-3.[15]  In the parties' supplemental briefing, and based on the updated number of class members, Mr. Taafua contends that the estimated net payment per class member will be a bit higher than his original estimate, i.e.,

---

[15] Mr. Taafua also noted that the estimated gross payment per class member would be approximately $119.  Dkt. No. 3.  That estimate, however, is based on the Global Settlement Fund and does not account for the administrative expenses, attorneys' fees and costs that would be deducted before the remaining funds are distributed to the putative class.

approximately $57.57. Dkt. No. 40 at 7. His calculations, however, appear to be the result of dividing the Net Settlement Fund by the total number of *class members*, whereas the Settlement Agreement provides that "[t]he amount of each individual payment will equal the Net Settlement Fund divided by *the number of consumer reports obtained* for the Settlement Class Members." Dkt. No. 34-2, Section III.4 (emphasis added). Based on the Settlement Agreement's prescribed method for calculating the estimated individual recovery, the Court noted at the motion hearing that each class member would receive approximately $40.61 for every report QGT procured with respect to that member.

The estimated $40.61 represents a significant 60% discount of the minimum possible recovery of $100 per report class members may recover in statutory damages. "If *Syed* strengthens [Mr. Taafua]'s case by suggesting that certain violations of § 1681b(b)(2)(A) are willful *as a matter of law*, [Mr. Taafua]'s risk of not being able to recover statutory penalties falls correspondingly." *Lagos v. Leland Stanford Junior Univ.*, No. 15-cv-04524-KAW, 2017 WL 1113302, at *6 (N.D. Cal. Mar. 24, 2017). The question remains whether the discount presented by the parties' settlement causes their agreement to fall outside the range of reasonableness.

In *Lagos*, for example, the court concluded that in view of *Syed*, the plaintiff's case was not so weak as to justify an 86% discounted recovery of $13.82 per class member. *Id*. at *8. In the present action, the parties' proposed settlement does not present as big a discount as in *Lagos*. The estimated $40.61 recovery is a sum that class members would receive without having to make a claim, and the parties' proposal accounts for the number of FCRA violations that occurred with respect to each class member and attempts to compensate them accordingly. At the same time, however, the estimated recovery is considerably lower than that obtained in two actions that Mr. Taafua cites as comparable examples.[16] *See Estes v. L3 Techs*., No. 3:17-cv-02356 (S.D. Cal.) (estimated recovery of $75 per class member); *Patton v. Church & Dwight Co., Inc.*, Case No. 5:18-cv-00903 (C.D. Cal.) (estimated recovery of $64.75 per class member). "The fact that a

---

[16] It is somewhat difficult to compare the present action to these examples. The parties' supplemental briefing suggests that the estimated individual payments in the example cases were calculated by dividing the net settlement amounts by the number of class members, and not by the number of reports procured.

proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (internal quotations and citation omitted). Even so, in view of *Syed*, the only significant hurdle to the relief sought in the present action appears to be the statute of limitations issue that affects Mr. Taafua and only about half of the putative class's claims. Thus, the Court cannot ignore the strong possibility that in the course of negotiating the settlement of this matter, the potential weakness of Mr. Taafua's claims resulted in a smaller recovery for the class as a whole, notwithstanding that approximately half of the class's claims present no timing issues.

### 3. Stage of Proceedings and Settlement Negotiations

The parties settled early in these proceedings, with little or no substantive litigation, and it is not apparent what discovery, if any, was conducted beforehand. The apparent lack of formal discovery, by itself, is not a bar to settlement inasmuch as the facts underlying Mr. Taafua's claims are straightforward, and there is no indication that he was inadequately prepared for the settlement discussions. *See Linney*, 151 F.3d at 1239 ("In the context of class action settlements, 'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement.") (citation omitted).

Nevertheless, because the proposed settlement was negotiated prior to formal class certification, "there is an even greater potential for a breach of fiduciary duty owed the class during settlement." *In re Bluetooth*, 654 F.3d at 946. "Accordingly, such agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *Id*. Courts must consider whether there are "subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id*. at 947. Several such signs are: (1) "when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded; (2) "when the parties negotiate a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds"; and (3) "when the parties arrange for fees

not awarded to revert to defendants rather than be added to the class fund." *Id.*

On the record presented, the Settlement Agreement does not include a "clear sailing" agreement, and as discussed above, the proposed settlement is fully non-reversionary with all unclaimed funds to be given as a *cy pres* award to NACA.

While the amount of fees requested by Mr. Taafua's counsel need not be finally determined at the preliminary approval stage, counsel's proposed fee award gives the Court some cause for concern. In evaluating a fees request, courts must consider "potentially problematic aspects of the relationship between the requested fees and the benefit to the class." *SFBSC Mgmt., LLC*, 944 F.3d 1035, 2019 WL 6721190 at *11 (internal quotations and citation omitted). Here, counsel request fees ($41,967.33) and costs ($3,000), for a total amount ($44,967.33) that is less than the $59,934.67 to be distributed to class members. Mr. Taafua's motion papers indicate that, as a cross-check on the requested sums, his counsel have already incurred lodestar fees of $37,307.50. Mr. Taafua's counsel further assert that their lodestar may ultimately exceed the requested fees and costs. As discussed at the motion hearing, however, the Court questions counsel's request for fees that are 33.33% of the total settlement, as well as their arguments favoring distribution as a percentage of the common fund, rather than payment based on a lodestar method. Here, Mr. Taafua argues that "[t]he typical range of acceptable attorneys' fees in the Ninth Circuit is up to 33.33% of the total settlement value." Dkt. No. 34 at 14). However, he cites no authority for that proposition. In the Ninth Circuit, for common fund settlements, courts typically apply a 25% benchmark for a reasonable fee award, but may, with an "adequate explanation," depart from that benchmark based on "special circumstances." *In re Bluetooth*, 654 F.3d at 942.[17]

Mr. Taafua's moving papers do not clearly articulate a basis for awarding fees above the 25% benchmark. While he argues that a fee award exceeding 25% of the common fund is justified as "fair compensation for undertaking complex, risky, expensive, and time-consuming litigation

---

[17] Mr. Taafua's cited authorities are not to the contrary. *See Staton*, 327 F.3d at 968; *Powers v. Eichen*, 229 F.3d 1249, 1256-57 (9th Cir. 2000); *Hanlon*, 150 F.3d at 1029; *Knight v. Red Door Salons, Inc.*, No. 08-01520 SC, 2009 WL 248367 at *6 (N.D. Cal. Feb. 2, 2009).

solely on a contingency basis" (Dkt. No. 34 at 12), as discussed above, *Syed* and other Ninth

Circuit decisions issued since the filing of the present lawsuit provide considerable clarity with

respect to the FCRA's stand-alone disclosure requirement and alleviate (if not eliminate) much of

the purported risk presented in this matter.  Additionally, while Mr. Taafua's motion papers

express a preference for the common-fund approach, he does not specifically address authorities

indicating that under fee-shifting statutes, such as the FCRA, courts must calculate fee awards

using the lodestar method.  *See Yeagley v. Wells Fargo & Co.*, 365 Fed. App'x 886, 887 (9th Cir.

2010) ("Under a fee-shifting statute such as the FCRA, *see* 15 U.S.C. § 1681n(a)(3), the lodestar

method is generally the correct method for calculating attorneys' fees."); *Staton*, 327 F.3d at 965

("Under a fee-shifting statute, the court must calculate awards for attorneys' fees using the

lodestar method.") (internal quotations and citation omitted).

### 4.    Service Award

In assessing whether "the proposal treats class members equitably relative to each other,"

Fed. R. Civ. P. 23(e)(2)(D), the Court considers whether the proposed settlement "improperly

grant[s] preferential treatment to class representatives or segments of the class . . . ."  *In re

Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1079 (internal quotations and citation omitted).

Here, the proposed *pro rata* distribution of the Net Settlement Fund based on the number of

reports procured for each individual class member is equitable.  However, Mr. Taafua requests a

$5,000 service award, which is a considerable sum in view of the small recovery each individual

class member likely will receive.  While service awards are permissible, they must also be

reasonable.  *Staton*, 327 F.3d at 977.  Courts must evaluate such awards individually, using

"relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class,

the degree to which the class has benefitted from those actions, . . . the amount of time and effort

the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace

retaliation."  *Id.* (internal quotations and citation omitted).  Courts in this district have recognized

that a $5,000 service award, as a general matter, is a reasonable amount.  *See Schofield*, 2019 WL

955288 at *7.  The requested $5,000 service award does not, by itself, indicate that Mr. Taafua

failed to settle this matter in the best interests of the entire class.  As discussed above, however,

1   the present litigation settled relatively early in the case with little substantive litigation, and Mr.

2   Taafua's moving papers provide minimal explanation, in conclusory fashion, for the requested

3   award.[18]

4       On this record, the requested service award for Mr. Taafua is not reasonable and reflects

5   preferential treatment at the expense of other class members, particularly those whose claims are

6   not affected by the statute of limitations defense discussed above.

7                   **5.    Notice**

8       Having reviewed the content of the parties' proposed notice of settlement, the Court finds

9   that the notice "clearly and concisely state[s] in plain, easily understood language" the nature of

10  the action, the class definition, and the class members' right to exclude themselves from the class.

11  Fed. R. Civ. P. 23(c)(2)(B).  Nevertheless, in light of recent guidance from the Ninth Circuit, it is

12  not clear whether the parties' proposed notice procedures are fair and adequate.  Rule 23 requires

13  the district court to "direct to class members the best notice that is practicable under the

14  circumstances, including individual notice to all members who can be identified through

15  reasonable effort."  *Id*.  This "requirement is designed to ensure that class notice procedures

16  comply with the demands of due process" and essentially means that the method of providing

17  notice "'must be such as [a person] desirous of actually informing the absentee might reasonably

18  adopt to accomplish it.'"  *SFBSC Mgmt., LLC*, 944 F.3d 1035, 2019 WL 6721190 at *7 (quoting

19  *Mullane v. Cent. Hanover Bank & Trust Co.*, 338 U.S. 306, 315 (1950)).

20      In the present case, the parties' settlement provides that the Settlement Administrator will

21  send notice to each class member by first class U.S. mail, using the last known addresses from

22  QGT's personnel records and information obtained from First Contact HR, the third party from

23  whom the subject consumer reports were procured.  For any notices that are returned as

24  undeliverable, the Settlement Administrator will conduct a trace, up to two times, to obtain a new

25  address to which the notice will be re-mailed.  Affected class members will have an additional 45

26

27  ───────────────

28  [18] Although Mr. Taafua apparently intended to submit additional information as required by the Court's order for supplemental briefing, no such information was filed with or submitted to the Court.

days from the re-mailing of the notice in which to request an exclusion. Dkt. No. 34-2, Section III.14. The proposed settlement does not contemplate sending any reminder notices to the putative class.

The Ninth Circuit has held "that neither due process nor Rule 23's standard necessarily require actual notice," *SFBSC Mgmt.*, 944 F.3d 1035, 2019 WL 6721190 at *8 n.7, and parties are not required to implement all potential options in every case, *id.* at *9. In the present matter, there is no indication that putative class members will be difficult to reach by mail. Nevertheless, in view of the settlement as a whole and the concerns described above, the Court questions whether the proposed single mailed notice, without any reminder notice, truly provides the best notice that is practicable under the circumstances. The motion for preliminary approval does not adequately address this issue.

## IV. CONCLUSION

Based on the foregoing, the Court is unable to preliminarily approve the class settlement because Mr. Taafua has not demonstrated that the putative class can be certified under Rule 23 or that the proposed settlement is fair, reasonable and adequate. His motion for preliminary approval is denied.

The Court sets a further case management conference for February 4, 2020, 1:30 p.m. to discuss further proceedings and any necessary modifications to the current case management schedule. The parties shall file a joint case management statement no later than January 28, 2020.

**IT IS SO ORDERED.**

Dated: January 8, 2020

VIRGINIA K. DEMARCHI
United States Magistrate Judge